THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
NO.: 5:07-HC-2139-D

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| Petitioner, | ) | |
| | ) | RESPONDENT'S PROPOSED |
| V. | ) | FINDINGS OF FACT AND |
| | ) | CONCLUSIONS OF LAW |
| ANDREW D. SHERADIN, | ) | (Local Civil Rule 52.1) |
| | ) | |
| Respondent, | ) | |

Now comes Respondent, Andrew D. Sheradin, by and through his attorney, R. Clarke Speaks, and proposes the following findings of fact and conclusions of law.

I. Introduction

This cause is before the court in the United States of America's petition to have Andrew D. Sheradin (hereinafter "Respondent") certified as sexually dangerous pursuant to the Adam Walsh Child Protections and Safety Act of 2006 (hereinafter "Adam Walsh Act"). 18 United States Code §§ 4247-4248.

The United States of America ("Petitioner") filed the initial petition against Respondent on July 27, 2007. Docket Entry (hereinafter "D.E") 1. Respondent filed a motion for hearing on November 15, 2007. D.E. 10.

The Court conducted a two-day evidentiary hearing on February 9th and 10th, 2012. After considering the testimony presented at that hearing, the evidentiary record, and the arguments of counsel, the Court concludes that the Petitioner has failed to

establish by clear and convincing evidence that Respondent, Andrew D. Sheradin, is sexually dangerous to others. 18 U.S.C. §§ 4247(a)(5)-(6).

II.  Findings of Fact

A. **Respondent's History**

1. Respondent Andrew Sheradin is a 40-year-old, divorced, Caucasian male who is currently held in the custody of the United States Bureau of Prisons pursuant to 18 U.S.C. § 4248(a). At the time of the filing of the Petitioner's certification, Respondent had completed serving a 120-month sentence following his conviction for Use of a Minor to Produce Child Pornography, in violation of 18 U.S.C. § 2251(a). E.D. New York Case No. 1:99-cr-00172 (Petitioner's (hereinafter "Pet.") Exhibit 13). Respondent's projected release date was August 1, 2007. Pet. Ex. 2.

2. Respondent was born in Geneva, New York, on April 21, 1971 to Kathy and Lewis Sheradin. Respondent's ("Resp.") Exhibit 14, pg. 4. Respondent is the second oldest of three children and was raised on a middle-class family. Id.

3. Respondent reached his developmental milestones, such as walking and talking, at the average times. Id. Respondent did not engage in maladaptive, or otherwise violent behavior as a child. Id. Respondent does not have a history of emotional or physical abuse. Id.

4. Respondent suffered from a learning disability, requiring special education programming throughout high school. Id. Respondent graduated from Dundee Central High School in 1990. Id.

5. Following graduation, Respondent joined the U.S. Army. Id. Respondent spent four year in the Military Police, before being honorably discharged as a Specialist E-4 in June of 1994. Id.

6. Following his honorable discharge from the U.S. Army, Respondent enrolled in Finger Lakes Community College in Canandaigua, New York. Id. Due to financial difficulties, Respondent was forced to abandon his academic pursuit at Finger Lakes Community College. Id.

7. Respondent has been employed as a cashier for Wal-Mart, Supervisor for Ames Apartment Store, sales person for Kauffman Department Store, projectionist for Movie Times and Regal Cinemas, lifeguard and a machine operator. Id. at 5.

8. Respondent is a bi-sexual man who acquired sexual information through his friends and the media. Id.

9. Respondent's first heterosexual experience was intercourse at the age of eighteen. Id. Respondent has subsequently had five sexual partners with relationships lasting between two months and two or more years. Id.

10. Respondent met his wife-to-be, Melissa in November of 1990. Id. Respondent and Melissa got married on January 25, 1991. Id. Respondent and Melissa shared a close, loving relationship, and produced a daughter, Kaitlyn. Id. While Melissa was pregnant, Respondent was stationed in Germany. Id. Melissa resided with her parents during her pregnancy while Respondent was stationed in Germany. Id.

11. Respondent and Melissa separated in April 1992 primarily due to Respondent's military transfer to Germany and lack of communication. (Pet. 12 at 407). Petition and Melissa were divorced on February 14, 1994. (Resp. 14 at 5).

12. Respondent has previously possessed and manufactured child pornography. (Resp. 14 at 6). Respondent's possession and manufacture of child pornography predates his current incarceration. Id.

13. Respondent's medical history is unremarkable, and he is not currently prescribed any medications from any medical professionals. Pet. 14 at 5.

14. Respondent does not have a history of alcohol or substance abuse. Id. Respondent has never required any form of substance abuse counseling. Id.

15. Respondent does not have a history of mental health-related problems. Id.

16. Respondent does not have a history of self-directed or interpersonal non-sexual violence. Id.

B. **Criminal History and Sexual Offense History**

17. Endangering the Welfare of a Child, Dundee, New York 1996. At 14 Bigelow Avenue in Dundee, New York, Respondent provided alcohol to a male minor, age 14, causing the child to become extremely intoxicated and sick. (Pet. 12 at 405). The victim provided a statement, which indicated that Respondent acted in a sexually inappropriate manner while in the victim's company, including showing him pornographic videos. Id. The victim never alleged any sexual contact. (Pet. 9, 1050 -1051). The local presentence report dated July 1994, reflects that the Respondent met the victim through his involvement as an assistant scout leader for Sea Explorers. Id. The Respondent asked the victim to help him paint a house, and the two began to participate in other activities three to four times a week. Id. The Relationship continued through the fall of 1994, and the victim slept over at the respondent's house on several occasions. Id. Respondent pled guilty to Endangering the Welfare of a

Child, but he denied having a sexual relationship with the victim. Id. Upon conviction, Respondent was sentenced to 3 years probation beginning in 1996. Id. Respondent violated the conditions of his probation in December of 1996 for Filing a False Incident Report. Id. at 406

18. Respondent was convicted upon plea of Guilty to Filing a False Incident report on December 4, 1996, and fined $250 with a $90 surcharge and one year-conditional discharge. Id.

19. On December 2, 1998, a second probation violation warrant was issued against Respondent for failure to report to his probation officer, conviction for Filing a false Incident Report, arrest preceding his child pornography conviction, his association with a known felon/child molester, and traveling outside of the jurisdiction without permission of probation officer. Id.

20. Use of a Minor to Produce Child Pornography, 18 U.S.C. § 2251(a), Eastern District of New York No. 99-CR-00172. Beginning in September 1998, and continuing through mid-November 1998, agents in connection with an undercover investigation, monitored conversations occurring over the Internet in "chat rooms." Id at 400. Respondent was among the participants in involved in these conversations, which confirmed that respondent along with a co-defendant (Leonard Gould, hereinafter "Gould"), were involved in the distribution and manufacture of child pornography. Id. Some of the monitored conversations made specific references to children under the age of 17. Id. Respondent and admitted during chat room conversations that he possessed material known to investigators to consist of depictions of minor children engaged in sexually explicit conduct. Id. A meeting was conducted on November

14, 1998 between Respondent, Gould, an undercover agent, and a confidential informant, in order to trade pornographic materials. Id. During this meeting, the undercover agent provided the Respondent and Gould three videotapes of minors engaged in sexually explicit conduct. Id. at 401. Respondent and Gould viewed a portion of one of the videotapes, and indicated that they were content with the images. Id. During this meeting, the Respondent stated that he had molested thirty-eight boys in the United States and Germany. Id. Respondent later denied this statement during an interview with investigating agents. Pet. 2 at 1343. The Respondent also provided the undercover agent with two videotapes containing child pornographic images. Pet. 12 at 401. Shortly after the aforementioned meeting, agents executed search warrants including one of Gould's residence and arrested Gould and the Respondent. Id.

21. Post arrest statements of Gould revealed an on-going Internet and in-person relationship with Respondent involving the trading and acquisition of child pornography. Id.

22. Respondent admitted to agents that he possessed the two original videotapes that he copies and provided to the undercover agent in his bedroom. Id. at 402. The remaining images of child pornography that Respondent possessed were contained in the laptop computer which was seized by agents. Id. Respondent admitted that he purchased and used the nickname "Bcuz" and that for one year (between 1997 and 1998), he operated a computer server used by participants to discuss and trade child pornography. Id.

23. Respondent admitted to being responsible for filming two series of videotapes of male child "D" (born November 1987) engaging in sexually explicit conduct, but denied taping the series of the boy's brother "L" (born November 1991). Id. Respondent denied touching "D" or appearing on any of the film. Id. at 403. Respondent lived with these two children during the time that the videotape series of "D" were taped. Id. at 402. Respondent met "D" and his family in September 1997, in Ithaca, New York. Id.

24. In a deposition dated January 19, 1999, "D" stated he met Respondent in September 1997 and shortly thereafter engaged in oral and anal sexual conduct with Respondent at the child's home. Id. "D" stated this conduct continued until April 1998, when it ceased. Id. "D" stated Respondent took still photographs of him as well as videotaped him. Id. These images involved sexually explicit conduct, including intercourse, and were the subject of the federal investigation that led to the Respondent's arrest for Use of a Minor to Produce Child Pornography. Id. Respondent has never been charged by any agency for having inappropriate sexual contact with "D" or any other minor. Id.

25. Following a conviction upon a plea of guilty, the Respondent was sentenced to a 120-month prison term with three years of supervised release. Resp. 14 at 10.

C. **Bureau of Prisons Disciplinary History**

26. Respondent has no history of disciplinary infractions in the Bureau of Prisons prior to being housed at FCI Butner in 2007.

27. During the Respondent's time at FCI Ray Brook, he participated in the Inmate Financial Responsibility Program, was employed in the Tool Room, where he

consistently received outstanding work evaluations, maintained clear conduct, and participated in several educational and vocational programs. Resp. 14 at 12.

28. While in the Bureau of Prisons, Respondent graduated with an Associate's Degree in Business Management from Ashworth Community College. Id. at 4.

29. Respondent has repeatedly received satisfactory to outstanding work evaluations while in the Bureau of Prisons. Resp. 2 and 3.

30. While in the Bureau of Prisons, Respondent consistently earned credit for Good Time for his behavior, which moved up his projected release date for his 1999 conviction approximately nine months. Resp. 9.

31. While detained at FCI Butner, the Respondent's incoming mail was intercepted and at times confiscated by staff for containing material that was deemed inappropriate.

32. Various books in Respondent's incoming mail were intercepted and confiscated by staff of FCI Butner due to having sexually explicit or inappropriate covers. Pet. 14 at 956.

33. On April 10, 2008, a staff member from the mailroom at FCI Butner informed Respondent that certain books in his incoming mail were returned/rejected due to their covers. Id. The staff member stated that he could have removed the covers and allowed the books, but that he did not have Respondent's permission to do so. Id. In response to this information, Respondent sent letters requesting that books with questionable covers be removed prior to mailing. Resp. 14 at 955.

34. On September 12, 2008 staff searched Respondent's cell for contraband. Pet. 15 at 947. During the search a number of items were confiscated. These items included photographs of males, ages unknown and unconfirmed, in various stages of undress.

35. On two other occasions, FCI Butner staff confiscated material from Respondent's cell. See Pet. Exs. 17 and 20. The items seized included two photo albums and various cut-out magazine images of young men, many of which were half dressed or in their underwear, and book or writings of an erotic nature. Id.

36. The photographs, writings, and books taken from Respondent are not in and of themselves illegal. However, Respondent has been put on notice that materials of a sexual nature are not tolerated in the Maryland Unit at FCI Butner.

37. The Court cannot find that the Respondent's possession of inappropriate materials in FCI Butner is directly related to a serious mental disorder which causes a loss of volitional control.

38. Respondent has not incurred any disciplinary reports for inappropriate or otherwise sexual violent behavior while in the Bureau of Prisons. Pet. 14 at 12.

D. **Additional Protective Factors and Family Support**

39. Respondent will be under three years of supervised release which includes a long list of requirements and restrictions which include: the defendant shall participate in mental health treatment, including but not limited to, participation in a treatment program for sexual disorders, at the direction of the Probation Department, as part of the treatment for sexual disorders: the defendant shall participate in a minimum of one annual polygraph examination to obtain information necessary for risk management, correctional treatment and to reduce the offender's denial mechanism. The polygraph examination must be conducted by a polygrapher trained specifically in the use of the polygraph for the monitoring of sex offenders where available, and at the expense of the sex offender. The results of the polygraph examination shall not

be used as evidence in a hearing to prove that a violation of supervision has occurred: the defendant shall not associate with or have any contact with convicted sex offenders unless in a counseling group; shall not be in contact with any children under the age of eighteen unless he has prior approval by the Probation Department and an adult approved by the Probation Department is present; the defendant shall not have children's toys or children's clothing in his possession without the prior knowledge and permission of the Probation Department; the defendant shall not enter places where children congregate such as parks, schools, playgrounds, video galleries, etc. without the prior approval of the Probation Department; the defendant shall not be a member of the North American Man Boy Love Association; unless otherwise indicated in the treatment plan provided by the sexual offender treatment program, is prohibited from viewing, owning or possessing any obscene, pornographic or sexually stimulating visual or auditory material including telephone, electronic mail, computer programs or computer services that are relevant to the defendant's deviant behavior pattern; will neither engage nor participate in any on-line computer services that involve the exchange of electronic messages or establish sexual encounters or liaisons; shall not call any sexually explicit telephone services and shall submit any copies of telephone bills to the Probation Department upon request; will not rent or have control of a U.S. Post Office Box without prior knowledge of the Probation Department; shall not work or volunteer for any business or organization that provides services to or employs persons under eighteen years of age; shall not purchase or possess photographic or video equipment without prior knowledge and permission by the Probation Department; shall forfeit all property listed in paragraph

4 of the plea agreement; and the defendant shall submit his person, residence, place of business, vehicle, or any other premises under his control to a search upon request by the United States Probation Department; failure to submit to a search may be grounds for revocation; the defendant shall inform any other residents that the grounds may be subject to a search pursuant to his condition; shall register under New York's sex offender law, McKinney's New York Correction Law § 169 et seq. ("Megan's Law"); the defendant shall report the address where he resides and any subsequent change of address to the Probation Officer responsible for his supervision, and that the defendant register in any State where the defendant is employed, carries on a vocation or is a student; the defendant is prohibited from possessing a firearm.

40. Respondent's family members including his parents, brother, and daughter have maintained their support of Respondent and will continue to do so upon the Respondent's release from custody.

41. Upon release, Respondent will reside with his parents, Lewis and Kathy Sheradin, at their home in New York. Respondent's parents are prepared to support Respondent financially and assist with his transition back into the community, including finding employment.

42. Respondent's parents stated they would have no difficulty or reservations reporting to officials any inappropriate or noncompliant behavior by the Respondent.

43. Respondent does not have a history of mental health problems. Pet. 12 at 409.

44. Respondent is willing to participate in sex offender treatment upon release including pharmacotherapy, if deemed necessary by a medical professional.

E. **Experts**

45. Sherri Bisci, MSW, LCSW, prepared a Pre-Certification Report of Respondent on April 24, 2007. Pet. 7. According to the report, Respondent participated in a pre-certification interview as part of the assessment procedure. Id. at 990. This Pre-Certification Report includes a diagnosis of Respondent with Axis I: Pedophillia, Sexually Attracted to Males, Nonexclusive Type; Paraphilia Not Otherwise Specified (Hebephilia); Reading Disorder (Provisional); and Disorder of Written Expression (Provisional), Axis II: no diagnosis. Id. at 991.

46. During the evidentiary hearing in this case the Court heard testimony from three experts. Dr. Manuel Gutierrez, Psy.D., and Dr. Hy Malinek, Psy.D., were called to testify on behalf of the Petitioner.

47. Respondent designated a forensic examiner (D.E. 45), Fabian Saleh, M.D. Dr. Saleh testified for Respondent at the hearing.

48. The experts filed written reports with the court pursuant to 18 U.S.C. § 4247(c).

i. Clinical Diagnoses

49. Each expert's report included a clinical diagnosis in which all three experts applied the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision (2000) or (DSM-IV-TR).

50. Dr. Gutierrez is a forensic psychologist employed at FCI Butner. In his October 15, 2007 report Dr. Gutierrez diagnosed Respondent with Pedophilia, Sexually Attracted to Males, Nonexclusive Type, 302.2 Paraphilia Not Otherwise Specified (Hebephilia), 302.9 (Provisional). Pet. 4 at 313.

51. Paraphilia Not Otherwise Specified, according to Dr. Gutierrez is a diagnosis allowed for coding paraphilias that do not meet the criteria for any other specific category. Pet. 5 at 1409. Hebephilia, according to Dr. Gutierrez, is a sexual attraction to adolescent or minors that are pubescent or postpubescent. Id. Dr. Gutierrez explained that the diagnosis of Hebephilia is not in the DSM-IV-TR. Id.

52. Dr. Gutierrez's March 16, 2011 Forensic Evaluation Update offered no amendment or changes to his October 15, 2007 diagnosis. Pet. 5.

53. Dr. Gutierrez has never conducted an in-person interview or meeting with the Respondent.

54. Dr. Malinek is a forensic psychologist retained by the Petitioner to evaluate Respondent. In his report, Dr. Malinek diagnosed Respondent with Pedophilia, Sexually Attracted to Males, Nonexclusive. Pet 2 at 1349. On November 4, 2011 this Court entered an Order appointing Dr. Malinek as an examiner, and compelling Respondent to submit to a psychological evaluation by him. (D.E. 57).

55. Dr. Malinek did not meet with Respondent or conduct any type of forensic evaluation or examination on him at any time point prior to his report, or to the hearing in this case.

56. Respondent's expert, Dr. Fabian Saleh, concluded that based on his evaluation of the Respondent it was his opinion to reasonable degree of medical certainty that the Respondent does not suffer from symptoms of a mental illness or a personality disorder. Pet. 14 at 16. Additionally, Dr. Saleh explained that based on his evaluation of Respondent that he could not conclude to a reasonable degree of medical certainty that Respondent presently suffers from either Pedophilia, Hebephilia, or any

symptoms of a paraphilic disorder. Id. at 16-17. Dr. Saleh further stated that he could not conclude to reasonable degree of medical certainty that Respondent suffers presently from a serious mental illness, abnormality, or disorder. Id. at 17.

ii. Actuarial Instruments

57. The experts in this case used at least one actuarial instrument in an attempt to describe how Respondent compares to other sex offenders in terms of risk of future offending should he be released. Each expert employed the STATIC-99R. Dr. Gutierrez additionally used the STATIC-99, and the RRASOR. Pet. 4-5. Dr. Malinek used the Minnesota Sexual Offender Screening Tool-Revised (MnSost-R), as well as a third actuarial, the STATIC-2002R. Pet. 2. The only additional actuarial instrument employed by Dr. Saleh was the Static-99, an earlier version of the Static-99R that does not account for the offender's age. Resp. 14.

58. Actuarials cannot predict the recidivism rate of an individual offender. See U.S. v. Hall, No. 11-7102, slip op., at 12 (4th Cir. Jan. 9, 2012). The actuarial instruments used by the experts in this case associate Respondent with the recidivism rate of some sample groups of sex offenders with a similar score on the individual actuarial. The Court considers expert testimony based on actuarial instruments relevant to the question of whether Respondent will have "serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6). However, "the ultimate question called for by the Adam Walsh Act concerns the self-control of an individual, not the statistical re-arrest patterns of a given population." United States v. Red Star, 5:06-hc-2222-BR, (E.D.N.C. filed January 3, 2012) (Britt, J.). The court has considered recidivism rates associated with Respondent's actuarial scores in

this case, but gives them less weight than Respondent's "past and current conduct, and the testimony of the experts as a whole." Id.

59. Dr. Gutierrez used the STATIC-99R to measure Respondent's relative risk. He scored Respondent with a total score of 4, which puts him in the "moderate-high" risk category. Pet. 5 at 1409. Dr. Gutierrez then compared Respondent's score to a pre-selected "High Risk/Need Group." Offenders from that sample have been found to sexually reoffend at a rate of 20.1% in five years and 29.6% in ten years. Id.

60. Dr. Malinek scored Respondent as a 4 on the STATIC-99R. Pet. 2 at 1354. Dr. Malinek opined that the "non-routine" offender group represented the best "fit" for Respondent. According to Dr. Malinek, offenders with a score of 4 on the STATIC-99R have shown recidivism rates of 15.4 in five years and 22.6 in ten years. Id.

61. In his October 15, 2007 report, Dr. Gutierrez scored Respondent as a 5 on the STATIC-99. Dr. Gutierrez stated that according the developers of both measures (STATIC-99 and STATIC-99R), recent research has suggested that the STATIC-99R is a better predictor of sexual recidivism. Pet. 5 at 1409. Dr. Gutierrez also scored Respondent as a 3 on the RRASOR. Pet. 4 at 314. According to Dr. Gutierrez, a score of 3 on the RRASOR is associated statistically with about a 29% likelihood for being re-convicted of a new sexual offense within ten years. Id.

62. Dr. Malinek scored Respondent as a 7 on the STATIC-2002R, which places the Respondent in the "moderate-high" risk category. Pet. 2 at 1355. Dr. Malinek compared Respondent's score to a pre-selected "High Risk/Need" or "non-routine" group and stated that offenders in this group have been found to sexually reoffend at a rate of 25.2% in five years and 35.8% in ten years. Id. at 1357.

63. The third actuarial instrument used by Dr. Malinek was the MnSOST-R, on which Respondent scored an 8, placing him in the "high" risk category. Id. at 1358. According to Dr. Malinek, individuals with a score of 8 have an expected recidivism rate of 30% within six years of release. Id.

64. Dr. Saleh found Respondent to have a total score of 2 on the STATIC-99R. Resp. 14 at 20. Dr. Saleh additionally utilized the STATIC99, and scored Respondent as a 3. Id. at 19. Dr. Saleh indicated that the scores he found for Respondent on both the STATIC-99 and STATIC99-R would have each been one point higher if it were concluded that his 1995 conviction was a sexually motivated offense. Id. at 18-20.

65. Dr. Saleh explained that given the significant limitations of the available risk assessment tools, he did not correlate the numerical scores to risk categories or risk ratios/rates. Id. at 17.

F. **Legal Principles**

66. The Adam Walsh Act creates a mechanism by which the government can seek the civil commitment of a "sexually dangerous person" in the custody of the Bureau of Prisons. See 18 U.S.C. § 4248. A "sexually dangerous person" has "engaged in or attempted to engage in sexually violent conduct or child molestation and who is sexually dangerous to others." 18 U.S.C. § 4247(a)(5). "Sexually dangerous to others" means that an individual "suffers from a serious mental illness, abnormality, or disorder as a result of which he would have serious difficulty in refraining from sexually violent conduct or child molestation if released." 18 U.S.C. § 4247(a)(6).

67. To obtain a commitment order against Respondent, the government must establish "three distinct facts by clear and convincing evidence: that [Respondent] (1) 'has

engaged or attempted to engage in . . . child molestation' in the past. 18 U.S.C. § 4247(a)(5); (2) currently 'suffers from a serious mental illness, abnormality, or disorder'; and (3) as a result of the illness, abnormality, or disorder, "would have serious difficulty in refraining from . . . child molestation if released,' 18 U.S.C. § 4247(a)(6)." U.S. v. Hall, No. 11-7102, slip op., at 7-8 (4th Cir. January 9, 2012).

G. **Past Violent Sexual Conduct or Child Molestation**

68. The Court finds that the Petitioner has proved by clear and convincing evidence that Respondent has engaged in "child molestation" in the past. 18 U.S.C. § 4247(a)(5).

H. **Serious Mental Illness, Abnormality, or Disorder**

69. With regard to this second element, the Petitioner has not proved by clear and convincing evidence that petitioner suffers from a serious mental illness, abnormality, or disorder. Three experts presented varying diagnoses of Respondent. The court concludes that Dr. Saleh's opinion is most convincing, and agrees that there is an absence of data to support a diagnosis of Respondent with a paraphilic disorder or any other related/unrelated condition. As such, the Respondent does not suffer from a "serious mental illness, abnormality, or disorder."

70. That psychological professionals analyzing the same individual could come to such a wide range of opinions about his psychological state belies the evolving nature of diagnosing mental health disorders. Kansas v. Crane, 534 U.S. 407, 413, 122 S.Ct. 867 (2002). However, the statutory definition of "serious mental illness, abnormality, or disorder" does not necessarily mirror the definitions set forth in the DSM-IV-TR. U.S. v. Carta, 592 F.3d 34, 40 (1st Cir. 2010). The current disagreement amongst the psychological community regarding the "Hebephilia" diagnosis has been

considered, but it is for the court to determine if Respondent suffers from the statutorily mandated mental disorder.

I. **Serious Difficulty Refraining**

71. The government must also establish that Respondent, if released, "would have serious difficulty in refraining from sexually violent conduct or child molestation." 18 U.S.C. § 4247(a)(6). Proof of a serious difficulty in controlling behavior cannot be demonstrated with "mathematical precision." Crane, 534 U.S. at 413. But evidence of the lack of volitional control must be significant enough "to distinguish the dangerous sexual offender whose serious mental illness, abnormality, or disorder subjects him to civil commitment from the dangerous but typical recidivist convicted in an ordinary criminal case." Id.

72. Two experts, Dr. Gutierrez and Dr. Malinek are of the opinion that Respondent would have serious difficulty in refraining from sexually violent conduct or child molestation if released. Pet. Exs. 2, 4, and 5.

73. Respondent's expert, Dr. Saleh, found to a reasonable degree of medical certainty that Respondent's mitigating factors outweigh those factors that increase the Respondent's risk for sexual reoffending behavior at this time.

74. The Court finds that the Respondent's age (40), family support, willingness to participate in sex offender treatment, lack of substance abuse history, employment record, lack of history of violence, lack of stranger victims and history of a relationship lasting more than two years in addition to the conclusion that he does not suffer from a major mental illness and will be on a three-year

term of supervision upon release and subject to sex offender registration requirements, outweighs Respondent's risk for sexual reoffending upon release.

III. Conclusion

For the foregoing reasons, the Court finds that Respondent, Andrew D. Sheradin, is not a sexually dangerous person under the Adam Walsh Act. 18 U.S.C. §§ 4247-4248. It is hereby ORDERED that the Attorney General immediately release Andrew D. Sheradin from the custody of the Bureau of Prisons.

Respectfully submitted, this the 2nd day of February, 2012

/s/ R. Clarke Speaks
Attorney for Defendant
Speaks Law Firm
2808 Market Street
Post Office Box 2823
Wilmington, NC 28402
(910) 341-7570
Fax (910)-341-7571
Clarke@speakslaw.com
State Bar No. 24538

CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and exact copy of this document has been served upon counsel for all parties in this case, or upon the parties themselves if counsel does not represent them, in the manner marked below.

\_\_\_\_ By placing a true and exact copy of the document in the United States Mail, addressed as indicated below, with sufficient postage thereon to carry the same to the addressee.

\_\_\_\_\_ By hand delivery to said counsel.

\_\_x\_\_\_By other means approved for service of pleadings.

This the 2nd day of February, 2012.

/s/ R. Clarke Speaks
Attorney for Defendant
Speaks Law Firm
2808 Market Street
Post Office Box 2823
Wilmington, NC 28402
(910) 341-7570
Fax (910)-341-7571
Clarke@speakslaw.com
State Bar No. 24538

To: W. Ellis Boyle
G. Norman Acker, III
R.A. Renfer
Assistant United States Attorney
310 New Bern Avenue, Suite 800
Raleigh, NC 27601-1461

Michael Lockridge
U.S. Department of Justice
Federal Bureau of Prisons
Butner Legal Center
P.O. Box 1600
Old Hwy 75
Butner, North Carolina 27509